RECEIVED
DEC 20 2005
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| ALBERT M. LEGER | * | CIVIL ACTION NO. 04-2254 |
| VERSUS | * | JUDGE DOHERTY |
| COMMISSIONER OF SOCIAL SECURITY | * | MAGISTRATE JUDGE HILL |

### REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Albert M. Leger, born March 23, 1949, filed an application for disability insurance benefits on July 6, 2001, alleging disability as of May 5, 2001, due to asbestos exposure, poor circulation in the legs, left shoulder socket pain, neck pain, burning and numbness in the feet, diabetes mellitus, and exogenous obesity. On March 22, 2004, the ALJ issued a partially favorable decision finding that claimant was entitled to a period of disability or disability insurance benefits beginning March 15, 2004, but not before, and continuing through the date of the decision. (Tr. 19). Claimant appeals that decision, asserting that his disability began in 2001 when he was forced to quit working. (rec. doc. 10, p. 2).

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) Records from Dr. Mark Dawson dated August 3, 1999 to June 16, 2000.**
On June 3, 1999, claimant was assessed with hyperlipidemia. (Tr. 124). He was seen on August 3, 1999 for burning in his feet and ankles, and pain in his upper back and legs. His neck had decreased range of motion. Dr. Dawson's impression was peripheral vascular disease, cervical spine disease, diabetes mellitus, alcohol abuse, and chronic obstructive pulmonary disease.

On May 10, 2000, claimant weighed 271 pounds, and his blood pressure was 170/94. (Tr. 123). His back and right side were still hurting. His x-ray was okay. The assessment was a lumbosacral sprain. Claimant was released.

**(2) Records from Medical Center of Louisiana at New Orleans dated March 30, 2001 to August 31, 2001.** On March 30, 2001, claimant was seen for

gradually worsening vision. (Tr. 137). His visual acuity was 20/200 in the right eye and 20/40 in the left. He had a cataract of the right eye. (Tr. 132).

An extracapsular cataract extraction with placement of posterior chamber intraocular lens of the right eye was performed on May 18, 2001. (Tr. 130). Post-surgery, claimant's vision had improved. (Tr. 127).

### (3) Consultative Internal Medicine Examination from Dr. Leandre Odom, D.O., dated December 29, 2001.

Claimant had a history of asbestos exposure six or seven months prior, diabetes mellitus type 2, hypercholesterolism, hypertension for which he was not taking medication, intermittent neck pain, and constant post-surgical left shoulder pain. (Tr. 139). He could dress and feed himself, stand for five minutes in an eight-hour day, walk on level ground for 150 to 200 feet, sit for no limit, lift 100 pounds, and drive a car. He complained of migrainous headaches every morning lasting one hour, and visual changes associated with pain, which medication seemed to help. His medications included Glucotrol, Lipitor, and gemfibrozil.

On examination, claimant was 69 inches tall and weighed 273 pounds. (Tr. 140). His blood pressure was 150/78. Snellen visual examination showed 20/200 in the right eye and 20/50 in the left without glasses. Claimant wore glasses, but did not bring them with him. (Tr. 139-40).

On spine and extremities examination, claimant's pulses were +2 throughout. (Tr. 140). He had clubbing in all digits, with no cyanosis or edema noted. His gait was normal. Grip was 5/5, with good fine and gross manipulations and good finger to thumb.

Claimant had full range of motion in all extremities, except for his neck and left shoulder. The neck had decreased range of motion at 60 degrees bilaterally, and the left shoulder had decreased forward elevation at 100 degrees, as well as abduction at 100 degrees. (Tr. 140-41). The supine leg raise was 85 degrees bilaterally, and the sitting straight leg raise was 90 degrees bilaterally. (Tr. 141). He was able to walk on his heels, squat, tandem walk, and walk on his toes without difficulty.

Neurologically, claimant had normal mentation, and no focal motor, cerebellar, or cranial nerve deficits. He had decreased sensation in his feet. His deep tendon reflexes were +2 throughout.

Dr. Odom's impression was diabetes mellitus type 2 with positive lower extremity numbness, left shoulder and neck pain with decreased range of motion, and decreased visual actuity. He noted no shortness of breath and no end-organ damage on examination. He also found no indication of alcoholism.

**(4) Physical Residual Functional Capacity Assessment dated February 19, 2002.** The examiner determined that claimant could lift 50 pounds occasionally and

4

25 pounds frequently. (Tr. 143). He could stand/walk and sit about 6 hours in an 8-hour workday. He had limited push/pull ability in his upper extremities. He had occasional postural limitations. (Tr. 144). Claimant had no visual limitations. (Tr. 145).

**(5) Records from University Medical Center ("UMC") dated January 17, 2001 to July 3, 2003.** On September 4, 2001, claimant complained of dyspnea with exertion for six months. (Tr. 156). It was noted that he had been noncompliant with his diet and medications. Chest x-rays were normal. (Tr. 160). The assessment was diabetes mellitus, obesity, and alcohol/tobacco abuse. (Tr. 155).

On October 9, 2001, claimant reported leg pain. (Tr. 152). It was noted that he was noncompliant with his medications. The assessment was uncontrolled diabetes mellitus due to noncompliance, uncontrolled dyslipidemia, hyponatremia, and leg numbness due to diabetes complications of peripheral neuropathy. He was advised to be more compliant and quit toabacco.

On October 18, 2002, claimant presented with claudication. (Tr. 151). A bilateral lower extremity arterial duplex ultrasound study dated showed severe atherosclerotic disease including areas of total occlusion, as well as more proximal aortoiliac disease.

A cardiolite scan dated January 8, 2003, showed a normal anterior, septal, lateral, and inferior wall perfusion, wall motion, and systolic wall thickening. (Tr. 182). The left ventricular ejection fraction was normal at 51%.

On January 14, 2003, claimant complained of right hip pain and a sharp pain in the calves after walking half a block. (Tr. 150). He also had numbness to the legs. The assessment was severe peripheral vascular disease, a history of hypertension and diabetes mellitus. The attending physician noted that it was indefinite as to when claimant would be able to resume work.

On March 19, 2003, claimant was admitted for peripheral vascular disease and half-block claudication. (Tr. 220, 222). Dr. Herbert Phelan performed a left femoral popliteal bypass with reverse saphenous vein bypass. His condition on discharge was good. (Tr. 220). Post-surgery, he was admitted on April 10, 2003 with a wound infection to the incision site. (Tr. 351-400).

On July 22, 2003, claimant stated that he had pain with ambulation. (Tr. 404). He had symptomatic improvement post-surgery. His chest wall abscess was improving on July 31, 2003. (Tr. 403).

**(6) Consultative Internal Medicine Examination by Dr. Aditya Nadimpalli dated September 27, 2003**. Claimant complained of poor circulation in his legs, shoulder problems, burning and numbness in his feet, diabetes, and obesity. (Tr.

407). He had occasional breathing difficulties, but was not on any medications for it. He reported that he had a femoral-popliteal bypass scheduled for October, 2003.[1]

Additionally, claimant complained of left shoulder pain and neck pain in the C6-7 area. He also had a history of high blood pressure and diabetes, for which he was taking medications. (Tr. 407-08). He had neuropathy. (Tr. 408). He had no chest pain or pulmonary difficulties.

Claimant also reported having throbbing headaches on the top of his head which occurred daily and lasted all day. These were associated with visual difficulties. Claimant stated that they were not relieved by over-the-counter analgesics.

Claimant reported that he could dress and feed himself. He could stand for 10 minutes at a time, walk one-half block, and sit without any problems. He could lift eight pounds with his right arm and none with his left. He was able to drive for about two hours. He could do household chores, including vacuuming and cooking. He used a cart for shopping, but was unable to mow grass or mop.

On examination, claimant was 68.5 inches tall and weighed 268 pounds. (Tr. 409). His blood pressure was 146/87. His vision was 20/100 in the right eye and 20/50 in the left. His funduscopic examination was normal. He had no cataracts in

---

[1] There are no reports in the record relating to this surgery.

either eye.

Claimant had full range of motion of the neck without any difficulties. His lungs were clear. His heart was S1 and S2 without any murmurs. His abdomen was obese.

On spine and extremities examination, claimant's pulses were +1 bilaterally. He had no edema, cyanonsis, or clubbing. He had no gait difficulties. Grip strength was 4/5 on the left and 5/5 on the right. His fine and gross motor manipulation were normal, including finger-to-thumb. He had no atrophy.

Claimant's shoulder had a marked decrease in range of motion on the left side. His forward elevation on the right was 140 degrees, and on the left was 55 degrees. His backward extension was 65 degrees on the right and 20 degrees on the left. Abduction was 170 degrees on the right and 40 degrees on the left. (Tr. 410). Internal rotation was 80 degrees bilaterally. His left shoulder had crepitus.

Claimant had full range of motion in the cervical spine. He was able to walk without any difficulties, and walk on his heels, toes, and heel-to-toe. He could lie straight back on the table. He had no ulcerations on his feet. Squatting was normal.

On neurological examination, claimant's motor strength was 5/5 globally. He had no atrophy. He had decreased sensation in his left lower extremity and decreased hair on his right leg. Deep tendon reflexes were 2+. Claimant had good lower

8

extremity proprioception.

Dr. Nadimpalli's impression was decreased left shoulder range of motion with crepitus, likely secondary to a past left shoulder injury; peripheral vascular disease with decreased pulses bilaterally; asbestosis, with no evidence of any pulmonary deficits; poor circulation; neck problems consisting of a minimally decreased range of motion on the left without any radiculopathy; burning and numbness in the feet, with no sensory deficits; diabetes, for which claimant was taking oral medications, and obesity. Claimant did not have any gait problems, and was able to walk without any assistive devices. (Tr. 411).

In the Medical Source Statement of Ability to do Work-Related Activities (Physical), claimant was found to be able to lift/carry 20 pounds occasionally and frequently. (Tr. 412). Standing, walking, and sitting were not affected by his impairment. (Tr. 412-13). He was limited in his push/pull ability due to a marked decrease in range of motion of his left shoulder. (Tr. 413). He had occasional limitations as to reaching due to his range of motion in the left shoulder. (Tr. 414).

**(7) Claimant's Administrative Hearing Testimony**. At the hearing on December 8, 2003, claimant was 54 years old. (Tr. 24). He had completed the ninth grade. He could read, write, and count. (Tr. 25).

9

Claimant had past work experience as a boilermaker. (Tr. 26). He testified that he had last worked on March 21, 2001, when he became injured. (Tr. 25). He said that he had tried to return to work, but could not walk because his legs and feet were hurting. (Tr. 25-26).

Regarding complaints, claimant testified that his left shoulder socket was "completely gone" and caused daily pain. (Tr. 29-30). He stated that he had had a shoulder surgery in 1992. (Tr. 29). He had also had left knee surgery in 1991 following a work-related injury.

Additionally, claimant testified that he had blockage in the bottom of each leg, for which he had surgery. (Tr. 30). He stated that he had numbness and tingling daily in his lower extremities. (Tr. 31). He complained that he had started having bad headaches daily after his surgery, for which he took Advil Migraine. (Tr. 30-31). He said that he had to lie down for about a half-hour or an hour until the headaches passed. (Tr. 31). He also reported having daily neck pain, diabetes, and a left eye cataract. (Tr. 32, 34, 36).

As to limitations, claimant testified that he could sit for about 20 to 30 minutes before his leg became numb. (Tr. 34). He could walk for about 50 yards, then had to stop to let the blood start circulating again. He reported that his left ankle started swelling after he stood for five to fifteen minutes. (Tr. 35). He stated that he could

not crawl, stoop, bend over, or climb ladders.

Regarding activities, claimant testified that he drove just about every day. (Tr. 37). He stated that he did very little around the house, but cooked a little bit. (Tr. 37-38).

**(8) Administrative Hearing Testimony of Beverly Prestonback, Vocational Expert ("VE").** Ms. Prestonback classified claimant's past work as a boilermaker as heavy with an SVP of 7. (Tr. 39). The ALJ posed a hypothetical in which she asked Ms. Prestonback to assume a claimant of the same age, education, and work experience, who was limited to light work with non-exertional limitations of occasional climbing, balancing, kneeling, crouching, crawling, and stooping, and no overhead reaching. (Tr. 39). In response, the VE testified that claimant could not perform his past relevant work, but could work as a cashier, of which there were 610,000 sedentary jobs and 1,684,000 light jobs nationally, and 11,000 sedentary and 31,000 light jobs statewide; sales counter clerk, of which there were 12,000 sedentary and 131,000 light jobs nationally, and 169 sedentary and 1,700 light jobs statewide, and janitors and cleaners, of which there were 195,000 light jobs nationally and 2,800 statewide. (Tr. 40).

In the next hypothetical, which was inaudible in parts, the ALJ asked the VE to assume a claimant who had light exertional limitations and non-exertional

limitations of no overhead reaching, Ms. Prestonback testified that claimant could not perform his past work, but could perform the other light jobs identified. (Tr. 40-41). When the ALJ changed the hypothetical again to assume a claimant with the same non-exertional limitations, but no work with the left upper extremity above 90 degrees, the VE opined that claimant could not perform his past work or the cleaning job, but the sales clerk and cashier jobs would be okay. (Tr. 41). She also identified the job of gate guard, of which there were 330,000 light positions nationally and 4,900 statewide. (Tr. 42).

Finally, the ALJ posed a hypothetical to assume a claimant with light exertional limitations, the same non-exertional limitations as in the previous hypothetical, and the ability to change positions or perform tasks while moving around. (Tr. 43). In response, Ms. Prestonback testified that he could not perform his past work, but could perform the jobs previously identified.

**(9) The ALJ's Findings are Entitled to Deference**. Claimant argues that: (1) the ALJ erred in analyzing his residual functional capacity and in failing to properly articulate his non-exertional limitations in her hypothetical questions posed to the vocational expert, and (2) there was no substantial evidence to support the ALJ's conclusions that claimant could sustain light work activity on an ongoing and regular basis.

12

As to the first argument, claimant argues that the ALJ failed to incorporate claimant's non-exertional limitations imposed by his atherosclerotic heart disease, vision problems, or diabetic neuropathy, into the hypothetical questions posed to the vocational expert. (rec. doc. 10, p. 5). He also asserts that the ALJ focused on Dr. Odom's 2001 consultative examination to determine that claimant had the RFC for light work and did not consider his subsequent heart problems. (rec. doc. 10, p. 4).

The record reflects that the ALJ posed four hypotheticals to the vocational expert. In the first, she asked the VE to assume a claimant who was limited to light work with the non-exertional limitations of occasional climbing, balancing, kneeling, crouching, crawling, and stooping, and no overhead reaching. (Tr. 39). In response, Ms. Prestonback testified that claimant could not perform his past relevant work, but could work as a cashier, sales counter clerk, and janitor and cleaner. (Tr. 40).

In the next hypothetical, the ALJ asked the VE to assume a claimant who had light exertional limitations and non-exertional limitations including no overhead reaching. In response, Ms. Prestonback testified that claimant could not perform his past work, but could perform the other light jobs identified. (Tr. 40-41). When the ALJ changed the hypothetical again to assume a claimant with the same non-exertional limitations, but no work with the left upper extremity above 90 degrees, the VE opined that the sales clerk and cashier jobs would be okay, but the cleaning

13

job would not. (Tr. 41). She also identified the job of gate guard. (Tr. 42).

Finally, the ALJ posed a hypothetical to assume a claimant with light exertional limitations, the same non-exertional limitations as in the previous hypothetical, and the ability to change positions or perform tasks while moving around. (Tr. 43). In response, Ms. Prestonback testified that he could not perform his past work, but could perform the jobs previously identified.

These hypothetical questions reflect that the ALJ recognized claimant's non-exertional, as well as exertional, limitations. While claimant argues that the ALJ failed to consider claimant's "heart problems" which required bypass surgery (rec. doc. 10, p. 4), the record reflects that claimant actually had femoral popliteal bypass surgery for blockage to his *legs*. (emphasis added). (Tr. 220-22). The ALJ specifically discussed this condition in her decision, and incorporated limitations into the hypotheticals reflecting claimant's lower extremity restrictions as to kneeling, crouching, crawling, and stooping. (Tr. 13-15, 39).

Additionally, the record reflects that the ALJ specifically considered claimant's alleged visual and diabetic limitations, but found that they did not affect his RFC. As to his vision, the ALJ noted that claimant had had cataract surgery in May, 2001. (Tr. 13, 130). She observed in August, 2001, his corrected vision was 20/30 in the right eye and 20/20 in the left. (Tr. 126). At his consultative examination with Dr. Odom

14

in December, 2001, claimant stated that he wore glasses. (Tr. 139). Dr. Nadimpalli found no cataracts or other visual limitations during his examination in 2003. (Tr. 409, 414). There is simply no evidence that claimant is experiencing vision problems at this time.

Regarding diabetes, the ALJ noted that claimant had a history of non-compliance with his medication. (Tr. 14, 152, 156). He also reported that he was drinking a case of alcohol every two days, despite his doctor's orders to stop drinking. (Tr. 178). It is well established that failure to follow prescribed medical treatment precludes an award of benefits. 20 C.F.R. § 416.930(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5th Cir. 1990). Additionally, Dr. Odom found no evidence of end organ damage from diabetes. (Tr. 141). Thus, there is no evidenced that claimant's diabetes affected his ability to work.

As the ALJ's hypothetical to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or his representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Next, claimant asserts that the ALJ failed to consider whether he could sustain work activity on a regular and continuing basis. (rec. doc. 10, p. 5). However, since

the issuance of its decision in *Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002), the Fifth Circuit has determined that the Commissioner is not required to make a specific finding regarding the claimant's ability to maintain employment in every case. *Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). As the court stated in *Frank*:

> *Watson* requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if [plaintiff] had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. **At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time.** An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate consideration of whether the claimant is capable of maintaining employment is required.

(emphasis added). *Id.* at 619.

Here, claimant has not demonstrated that his intermittently recurring symptoms were of sufficient frequency or severity to prevent him from holding a job for a significant period of time as required by *Watson*. As noted by the ALJ, the

16

objective evidence does not support the severity of the complaints alleged by claimant. (Tr. 14-15). The ALJ cited one report from a treating source indicating that claimant was disabled from employment. (Tr. 14, 150). While the ALJ noted that the disability determination is reserved for the Commissioner, she still considered this opinion. *See Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. § 1527(e)(1)) (among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work." These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner.").

Considering claimant's complaints, the ALJ determined that claimant was not able to perform the full range of light work, and identified jobs that he could perform. (Tr. 16). Her finding is supported by the opinion of Dr. Nadimpalli, who determined that claimant could lift/carry 20 pounds, had no limitations as to standing, walking, and sitting, and was limited only as to his pushing/pulling and reaching due to decreased range of motion in his left shoulder. (Tr. 412-14). Even with these left shoulder limitations, the ALJ, relying on the vocational expert, was able to identify jobs that claimant could perform. (Tr. 16, 39-44).

In conclusion, claimant has not shown that his intermittently recurring symptoms were of sufficient frequency or severity to prevent him from holding a job

for a significant period of time. Thus, this argument lacks merit.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed this 19 day of December, 2005, at Lafayette, Louisiana.

*C. Michael Hill*
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

COPY SENT:
DATE: 12-20-05
BY: GKA
TO: RFD
CMH